U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT
JUL 02 2007
ROBERT H. SHEMWELL, CLERK
BY ____ DEPUTY

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**SHREVEPORT DIVISION**

---

LAMPSHIRE ENTERPRISES, INC., d/b/a
GAS SERVICE & SUPPLY

versus

CIVIL ACTION NO. 06-0381
JUDGE TOM STAGG

MJC ENGINEERING AND
TECHNOLOGY, INC.

---

**MEMORANDUM RULING**

Before the court is a motion for summary judgment filed by the defendant, MJC Engineering And Technology, Inc. ("MJC"). See Record Document 18. For the reasons set forth below, the defendant's motion is **DENIED.**

## I. BACKGROUND

### A. Factual Background.

MJC is a company based in California that acquires metal spinning machines, retrofits the machines, and sells them to third parties. Typically, metal spinning machines are used by a manufacturer to spin metal pieces that will be used to

manufacture a product.

The plaintiff, Lampshire Enterprises, Inc., doing business as Gas Service & Supply ("GS&S"), is a company that manufactures precision fluid-measuring vessels of various kinds. In May 2003, GS&S, through its president and sole shareholder, Don Lampshire ("Lampshire"), approached MJC to inquire about purchasing a metal spinning machine to produce the parts it needed to make two-piece five-gallon metal measuring cans. MJC's representative, Herbert Franck ("Franck"), told GS&S that the parts could be made by metal spinning and recommended a used Liefield 450 ATM machine.

In August 2003, MJC contacted GS&S and recommended another machine that had become available, a used Cincinnati 4520 spinning machine. GS&S agreed, and on September 4, 2003, it submitted a purchase order for the Cincinnati spinning machine for the price of $160,866, with a down payment of $30,000.

MJC prepared engineering drawings for the tools needed to spin the parts on the Cincinnati machine, and GS&S used the drawings to have the tools fabricated by a machine shop in Shreveport, Louisiana. The parts were then delivered to MJC in

California. GS&S advised MJC that it needed a sample of the product it intended to manufacture for demonstration at trade shows. Using the tools provided by GS&S, MJC had the parts for the sample product, a five-gallon can made from two pieces of spun metal, made by a metal spinning shop in California.

In October 2003, MJC advised the plaintiff that the machine was ready, and Lampshire traveled to California to witness a demonstration of the finished machine. At the demonstration, the machine did not perform adequately, however, MJC advised Lampshire that the problems were minor and the machine would be adjusted before delivery. The machine was shipped to the GS&S shop in Bossier Parish, Louisiana on January 21, 2004.

**B. Procedural Background.**

GS&S filed the instant suit under Louisiana Civil Code Article 2524, asserting that the spinning machine purchased from MJC was not fit for its intended use. GS&S claims that MJC knew that its purpose for acquiring the machine was to manufacture five-gallon cans produced from only two pieces of spun metal, as opposed to the four-piece models produced by competitors. GS&S points to the two-

part sample product created by MJC as evidence that MJC knew of the intended design. GS&S contends that between February 2004 and January 2006, MJC representatives made multiple unsuccessful attempts on the subject spinning machine to duplicate the two metal pieces needed to manufacture a two-part can.

MJC argues that while the parties originally discussed using the machine to create the pieces for a two-part can, these plans were abandoned when the parties agreed to program the machine to make the pieces for a four-part can. MJC asserts that it believed GS&S's intended use for the machine was to create a five-gallon can, and that the machine can produce the pieces necessary to create a four-part five-gallon can and is therefore fit for its intended use. MJC points out the large number of four-part cans that GS&S produced, using the machine, to fulfill an order by the Texas Department of Agriculture. MJC further states that the machine is able to produce the parts for a two-part can because its metal-spinning expert, Franck, produced such parts using the machine before the machine was delivered to GS&S.[1]

[1]No evidence of parts sufficient to assemble the designed two-piece can has been produced to date.

MJC filed the instant motion for summary judgment arguing that there are no material issues of fact in dispute and that MJC is entitled to judgment as a matter of law.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate

specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004) (citations and quotations omitted).

All facts and inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts are resolved in that party's favor. See Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1016 (5th Cir. 1990). If factual issues or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied. See id.

**B. Not Fit For Intended Use.**

Louisiana Civil Code Article 2524 provides:

> The thing sold must be reasonably fit for its ordinary use.
>
> When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.
>
> If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations.

Comment (b) to Article 2524 states that when the thing is not fit for its ordinary use, "the buyer may seek dissolution of the sale and damages, or just damages, under the

general rules of conventional obligations."

**1. Seller Had Reason To Know Buyer's Particular Intended Use.**

GS&S must first establish that MJC was aware of its particular intended use for the machine: to produce the parts necessary to manufacture two-piece five-gallon cans. In the responses to MJC's interrogatories, Lampshire states that he met with Franck, an MJC representative, in May of 2003, to discuss the possibility of reducing the parts necessary to produce five-gallon cans to only two parts by using a metal spinning machine to create the two parts. See Record Document 18, Ex. A. Lampshire asserts that Franck, a person known by Lampshire to have vast experience with metal spinning, indicated that the parts could be fabricated by metal spinning, and that a "Computer Network Controls" equipped machine could replicate the process in mild and stainless steel. See Record Document 24, Lampshire Affidavit.

Lampshire claims that Franck recommended the machine GS&S purchased and assured him that the particular machine would be suitable for GS&S's application. See id. Lampshire also states that, upon his request, MJC provided the pieces for a demonstration model of the two-piece can GS&S planned to manufacture. See id.

All of these assertions by Lampshire, if taken in the light most favorable to GS&S as required by the summary judgment standard, support a finding that MJC was aware that GS&S's intended use for the machine was to create the parts needed to manufacture two-piece cans. See Puckett, 903 F.2d at 1016.

MJC admits that the parties originally discussed a two-part design, but argues that this design was abandoned when GS&S agreed to have the machine programmed to create the pieces for a four-piece can. It argues that GS&S's particular intended use for the machine was to produce five-gallon cans, not five-gallon cans of a particular design. However, GS&S claims that the production of the four-part cans was only done as a remedial measure, to fulfill an order it received before it became aware that not even Franck could get the machine to produce the pieces for the two-piece can.

The resolution of this issue requires a determination of whose testimony is more credible: Lampshire's or Franck's. Lampshire's testimony is supported by other evidence, such as the demonstration model that was made from the original two-piece design. Therefore, GS&S has met its burden of proving there is a genuine issue

of fact regarding MJC's knowledge of GS&S's intended use for the spinning machine.

**2. Buyer Relied On Seller's Skill Or Judgment In Selecting Thing.**

Lampshire states that he had no experience with metal spinning at the time he inquired with MJC regarding the purchase of the spinning machine. See Record Document 24, Lampshire Affidavit. Lampshire also claims that Franck had been represented to him as "a person with vast experience in metal spinning." Id. at 2. He further asserts that he agreed to purchase the spinning machine after Franck told him that the parts he needed could be fabricated by metal spinning and recommended the Cincinnati 4520 spinning machine, stating it would be perfectly suitable for GS&S's needs. See id. Lampshire's statements are evidence that he, acting for GS&S, relied upon Franck's skill or judgment in selecting the particular spinning machine.

Furthermore, MJC admits that it offered "skill and knowledge in the area of metal spinning." See Record Document 18 at 3. MJC further asserts that Franck is an expert in metal spinning. See Record Document 29. These statements support Lampshire's assertion that he relied on Franck's skill and experience.

Accordingly, the plaintiff has met its burden of providing sufficient evidence from which a fact finder could conclude that GS&S relied on MJC's skill or judgment in selecting the particular machine.

**3. Thing Not Fit For Its Intended Use.**

Lampshire claims that when the machine was ready, he traveled to California for a demonstration, but that the machine did not produce the desired parts. See Record Document 24, Lampshire Affidavit. He asserts that he was assured by Franck that there was a problem with the automatic program that could easily be remedied, so he agreed to accept delivery. See id.

Lampshire further states that another MJC representative made a trip to GS&S's shop after the machine was delivered and attempted to program the machine to produce the pieces necessary to manufacture the two-piece can, but that his efforts were also unsuccessful. See id. However, this representative told Lampshire that he was not an expert in the programming of the machine and that Lampshire should contact Franck. See id. Then, approximately nine months after receiving the machine, Lampshire asserts, Franck finally traveled to GS&S's shop and was again

unable to program the machine to fabricate the desired parts. See id.

Approximately four months prior to Franck's visit, GS&S had accepted an order from the Texas Department of Agriculture ("the Department") for fifty-nine cans. See id. Lampshire states that because GS&S wanted to honor its commitment to the Department, it worked with Franck to develop the tools and programs for a four-piece five-gallon can after Franck was unable to program the machine for the two-piece can. See id. Lampshire argues that the four-piece can was not an acceptable replacement for the original two-piece design because it was similar to a product made by a competitor and because its assembly was time consuming, expensive, and difficult. See id. Therefore, Lampshire states, GS&S accepted no other orders, and after the Department's order was completed, GS&S returned the machine to MJC and filed the instant suit. See id.

MJC argues that the machine was fit for its intended use because the machine was able to spin the parts necessary to produce a four-piece can. See Record Document 18. Although the parties had originally discussed using a two-piece process to manufacture the cans, MJC asserts, they ultimately agreed on the four-

piece process. See id. According to MJC, the only problems GS&S experienced with the four-piece cans were caused by GS&S's own inadequate welding and soldering. See id.

MJC further asserts that Franck was able to produce the pieces for the two-piece design sometime after Lampshire's demonstration trip to California, but before the machine was delivered, and therefore, the machine is also fit for that particular use. See Record Document 29. Franck is an expert in metal spinning, MJC argues, and his testimony that the machine is fit for the intended use of creating the two pieces can only be rebutted by another expert's testimony.[2] See id.

MJC's arguments lack merit. MJC does not dispute that Franck was unable to program the machine to create the pieces necessary for the two-piece can at any time while Lampshire was present. Furthermore, GS&S asserts that it was unaware that

---

[2]This argument is unpersuasive. Franck is so intimately involved with this case that his testimony can hardly be considered the same as an outside expert's testimony. In addition, Lampshire need not be an expert to testify that no one from MJC, including Franck, was ever able to produce the two pieces in his presence. This is evidence that the machine was not fit for the intended use of creating the pieces to be used in manufacturing the two-part cans, and Franck's statements do not preclude such a finding.

Franck had ever produced the two pieces using the machine until well after the instant suit was filed. Even if Franck was able to produce the parts one time, this does not show that the machine was fit for its intended use of producing the pieces repeatedly. If the production of the pieces was so difficult that even Franck, whom MJC names a metal spinning expert, could not produce them at any time while Lampshire or any other GS&S representative was present, the fact finder could conclude that the machine was not fit for its intended use. Manufacturing the two-piece cans would not be feasible if producing the pieces was so difficult that even an expert in spinning could produce the pieces for one can only after several attempts and never in the presence of the buyer who was to be using the machine.

The fact finder could determine that during the time GS&S possessed the subject spinning machine, no one from MJC could program the machine to produce the pieces necessary for the two-piece can. From this, the fact finder could conclude that the machine was not fit for its intended use. Therefore, a genuine issue of material fact exists as to whether the spinning machine was fit for its intended use.

## III. CONCLUSION

GS&S has presented sufficient evidence to establish a claim for which relief can be granted. Although MJC has presented similar evidence contradicting GS&S's contentions, questions of fact remain. It is necessary for the fact finder to hear testimony and evaluate the credibility of each witness in order to resolve the relevant factual questions.

Accordingly, MJC's motion for summary judgment (Record Document 18) is **DENIED**.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 2nd day of July, 2007.

JUDGE TOM STAGG